IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GREGORIO IGARTÚA, *et al.*, | |
| **Plaintiffs,** | |
| v. | CIVIL NO. 14-1558 (JAG) |
| UNITED STATES OF AMERICA, *et al.*, | |
| **Defendants.** | |

OPINION AND ORDER

GARCIA GREGORY, D.J.

On July 14, 2014, Gregorio Igartúa, Carlos Mendez-Martinez, Jorge Perez-Diaz, Pedro Mendez-Soto, Iris Gonzalez-Camacho, and Maria Negron-Cedeno (collectively "Plaintiffs") filed a complaint against the United States of America, the President of the United States, the Secretary of Commerce, and the Clerk of the U.S. House of Representatives, all in their official capacities (collectively "Defendants") seeking declaratory judgment and other relief. Docket No. 1. Plaintiffs claim that the U.S. citizen-residents of Puerto Rico are entitled to vote for representatives from Puerto Rico to the U.S. House of Representatives. Id. Specifically, Plaintiffs argue that the U.S. Constitution, international treaties, and customary international law compel Defendants to take the necessary steps for the apportionment of congressional districts in Puerto Rico. Id. Furthermore, Plaintiffs ask this Court to convene a three judge panel to evaluate and decide the merits of the instant case pursuant to 28 U.S.C. § 2284. Docket Nos. 2-3. Defendants, on the other hand, have filed a Motion to Dismiss under both Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). Docket No. 11.

Civil No. 14-1558 (JAG)                                                                              2

This is Plaintiff Igartúa's fifth case concerning the enfranchisement of the U.S. citizen-residents of Puerto Rico and their participation in the federal electoral processes. In the first three cases, including an en banc decision, the First Circuit held that Puerto Ricans do not have a legal right to vote for the President and Vice President of the United States. See Igartúa-De La Rosa v. United States (Igartúa III), 417 F.3d 145 (1st Cir. 2005) (en banc); Igartúa De La Rosa v. United States (Igartúa II), 229 F.3d 80 (1st Cir. 2000) (per curiam); Igartúa De La Rosa v. United States, 32 F.3d 8 (1st Cir. 1994) (per curiam). In his fourth case, Plaintiff Igartúa brought suit claiming that the U.S. citizen-residents of Puerto Rico have a right to vote for Representatives from Puerto Rico in the U.S. House of Representatives. See Igartúa v. United States (Igartúa IV), No. 08-1174 (D.P.R. June 3, 2009), aff'd, 626 F.3d 592 (1st Cir. 2010), cert. denied, 132 S. Ct. 2376 (2012). [1] This Court dismissed the complaint in that case and the First Circuit, upon *de novo* review, affirmed the dismissal. Id.

Plaintiffs' arguments in the Complaint at bar are nearly identical to the ones raised in Igartúa IV. Since the text of the Constitution has not been amended, Puerto Rico's political status has not changed, and the relevant jurisprudence continues to be the same, it follows that a contrary result in this case is foreclosed by this Circuit's precedent. For the reasons outlined below, Plaintiffs' Motion Requesting a Three-Judge District Court is DENIED and Defendant's Motion to Dismiss is hereby GRANTED.

---

[1] In addition to Plaintiff Igartúa, some of the parties in the instant case, specifically Plaintiffs Carlos Mendez-Martinez, Jorge Perez-Diaz, and Pedro Mendez-Soto, were also parties in Igartúa IV.

## STANDARD OF REVIEW

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). As courts of limited jurisdiction, federal courts have the duty of narrowly construing jurisdictional grants. See, e.g., Alicea-Rivera v. SIMED, 12 F. Supp. 2d 243, 245 (D.P.R. 1998). Since the justiciability requirement of standing is generally viewed as a component of subject matter jurisdiction, see, e.g., Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1280-81 (1st Cir. 1996), standing challenges are more appropriately brought under Fed. R. Civ. P. Rule 12(b)(1). See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001) (stating that justiciability issues should be analyzed under Rule 12(b)(1)). Accordingly, this Court evaluates Defendants' Motion to Dismiss under the standard for motions brought pursuant to Rule 12(b)(1).

Motions brought under Rule 12(b)(1) are subject to the same standard of review as Rule 12(b)(6) motions. Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994). To survive dismissal for failure to state a claim, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007). According to Twombly, the complaint must state enough facts to "nudge [plaintiffs'] claims across the line from conceivable to plausible." Id. at 1974. Therefore, to preclude dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the complaint must rest on factual allegations sufficient "to raise a right to relief above the speculative level." Id. at 1965.

At the motion to dismiss stage, the court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990). Thus, the plaintiff bears the burden of stating

factual allegations regarding each element necessary to sustain recovery under some actionable theory. Goolev v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988). The court need not address complaints supported only by "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

## ANALYSIS

### I.   Plaintiffs' Request for a Three-Judge District Court

Plaintiffs ask this Court to appoint a Three-Judge Court to resolve the merits of this case pursuant to 28 U.S.C. § 2284. Docket Nos.2-3. Section 2284 provides, in relevant part that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts, or the apportionment of any statewide legislative body." Plaintiffs argue that the judicial disposition of this case requires that a three-judge court be convened as in Adams, 90 F. Supp. 2d 35, 72 (D.D.C. 2000) (per curiam), aff'd without opinion, 531 U.S. 941 (2000), where a three-judge district court held that the District of Columbia is not a "State" for purposes of Article I of the Constitution and, as a result, its residents may not vote in congressional elections. Docket No. 2 at 2. Defendants, on the other hand, argue that Plaintiffs' claims are meritless and that a three-judge court is not necessary when the constitutional claim raised is insubstantial. Docket No. 12 at 2 (citing Butler v. Dexter, 425 U.S. 262, 266 (1976)).

The First Circuit already rejected this request in Igartúa IV when it held that Plaintiffs' action cannot be construed as a challenge to the constitutionality of the apportionment of congressional districts. Igartúa IV, 626 F.3d at 598 n.6. In other words, the First Circuit already found that Plaintiffs' claims for political inclusion do not meet the requirements of 28 U.S.C. §

2284. While it is true that a three-judge court was convened to adjudicate similar claims in Adams, this Court finds that such a court is not necessary in this case since Plaintiffs' constitutional and international law claims were already rejected in previous decisions, particularly in Igartúa IV.  The First Circuit stated in Igartúa IV that "[s]ince Puerto Rico is not a state, and cannot be treated as a state under the Constitution for these purposes, its citizens do not have a constitutional right to vote for members of the House of Representatives." Id. at 594. The First Circuit also stated that "Igartúa's claim that international law requires a contrary result is foreclosed by our decision in [Igartúa III]." Id. (citing Igartúa III, 417 F.3d 145). Moreover, in light of the controlling authority relevant to this case, Plaintiffs' request for a three-judge court is unfounded. See Vazza v. Campbell, 520 F.2d 848 (1st Cir. 1975) (finding that a previous decision and its subsequent affirmance had rendered the parties' claims "wholly insubstantial" for purposes of convening a three-judge panel). Therefore, this Court rejects Plaintiffs' request.

## II.     Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

Defendants argue, *inter alia*, that this case must be dismissed because Plaintiffs lack standing to assert the constitutional and international law claims in the Complaint. Docket No. 11 at 5-7. Specifically, Defendants contend that Plaintiffs lack standing to assert their constitutional claims because they neither show that the alleged harm is fairly traceable to the Defendants' actions nor that a favorable decision is likely to redress the alleged harm. Id. As to the international law claims, Defendants argue that Plaintiffs do not have standing to raise these claims because the alleged harm is not likely to be redressed by a favorable judicial decision. Id.

As a result, Defendants assert that this Court lacks subject matter jurisdiction to entertain Plaintiffs' claims. Id.

Moreover, Defendants contend that Plaintiffs have failed to show that their international law claims fall within the scope of a waiver of federal sovereign immunity. Id. at 7-9. Also, Defendants assert that the claim that Puerto Rico has evolved into a *de facto* "state" under Article I constitutes a non-justiciable political question. Id. at 9-11. Finally, in the alternative that this Court decides to exercise its subject matter jurisdiction, Defendants argue that Plaintiffs fail to state any valid claim upon which relief can be granted. Id. at 11-23. [2] This Court holds that it has no subject matter jurisdiction to entertain Plaintiffs' claims for lack of standing. This holding is consistent with the First Circuit's affirmance in Igartúa IV, which considered and rejected virtually identical claims to the ones raised in the instant case.

### A. Plaintiffs' Standing: Absence of a Legally Cognizable Injury

It is well-established that "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies '" Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471 (1982). This is because federal courts are courts of limited jurisdiction and do not have "an unconditioned authority to

---

[2] Plaintiffs' constitutional claims consist of violations of their equal protection and due process rights, as well as the right to travel and the right to vote under the Privileges and Immunities Clause. Docket No. 1 at 2-3. The international law claims, on the other hand, consist of violations of the right to vote and participate in free and fair elections under (1) the International Covenant on Civil and Political Rights, opened for signature Dec. 16, 1966, 999 U.N.T.S. 171; (2) the Universal Declaration of Human Rights, G.A. Res. 217 A(III), U.N. Doc. A/810 (1948); (3) the Inter-American Democratic Charter of the Organization of American States, 28th Spec. Sess., OAS Doc. OEA/Ser. P./AG/RES.1 (XXVIII-E/01) (OAS General Assembly) (Sept. 11, 2001); (4) the American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX (1948), O.A.S. Off. Rec. OEA/Ser. LV/I.4 Rev. (1965); and (5) customary international law. Docket No. 1 at 46-58.

determine the constitutionality of legislative or executive acts." Id. It is also clear that a case or controversy requires litigants bringing forth a claim to demonstrate their "standing to challenge the action sought to be adjudicated in the lawsuit." Id. (quotation marks omitted). The standing doctrine embedded in Article III of the Constitution is an example of a "judicially self-imposed limit[] on the exercise of federal jurisdiction." Allen v. Wright, 468 U.S. 737, 750 (1984). To ignore or bypass this important constitutional requirement would be to overstep those carefully considered boundaries imposed upon the judiciary by our Constitution.

    In order to establish standing under Article III, Plaintiffs must meet the following three requirements:

> (1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a "fairly . . . treace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 274 (2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)). As to the first prong of the standing doctrine requirements, it is well-established that the injury or harm alleged in a complaint must be an "invasion of a *legally protected interest*." Lujan, 504 U.S. at 560 (emphasis added). Additionally, the injury alleged must be "distinct and palpable," as opposed to "abstract" or "hypothetical." Warth v. Seldin, 422 U.S. 490, 501 (1975). Furthermore, the plaintiff bears the burden of proving that he "has sustained or is immediately in danger of sustaining some direct injury," that is, whether the injury in fact is both "real and immediate." O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

The First Circuit already rejected claims virtually identical to those raised in the Complaint at bar; in light thereof, this Court finds that Plaintiffs have failed to satisfy the injury-in-fact requirement. This is because Plaintiffs have not demonstrated that a legally protected interest was harmed in this case. First, Article I of the U.S. Constitution extends the right to participate in congressional elections to "the People of the several States." U.S. Const. art. I, § 2.[3] The First Circuit has explicitly held that Puerto Rico is not a "State" for purposes of Article I and, thus, is not entitled to representatives in the U.S. House Representatives. Igartúa IV, 626 F.3d at 596. While seating en banc, the First Circuit held: "The text of the Constitution defines the term "State" and affords no flexibility as to its meaning . . . . Because Puerto Rico is not a state, it may not have a member of the House of Representatives." Id. (emphasis in original). Furthermore, other courts of appeals have also held that U.S. territories cannot be defined as "States" for purpose of Article I and II of the U.S. Constitution. See, e.g, Ballentine v. United States, 486 F.3d 806, 811 (3d Cir. 2007) (holding that the Virgin Islands is not a state for purposes of federal elections); Attorney Gen. of the Territory of Guam v. United States, 738 F.2d 1017, 1019 (9th Cir. 1984) (holding that Guam is not a state for purposes of federal elections).

Plaintiffs correctly point out that the U.S Supreme Court and the First Circuit have interpreted the term "State" in other parts of the Constitution to include Puerto Rico. Igartúa IV, 626 F.3d at 615-616 (Torruella, J., concurring and dissenting in part) (citing numerous cases holding that Puerto Rico should be treated as a state for purposes of various constitutional

---

[3] Article I provides, in relevant part: "The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States* and the Electors *in each State* shall have the Qualifications requisite for Electors of the most numerous Branch of *the State* Legislature." U.S. Const. art. I, § 2, cl. 1 (emphasis added). In addition, "Article I itself uses the term 'State' or 'States' eight times when defining and outlining the House of Representatives." Igartúa IV, 626 F.3d at 595.

provisions). For example, it is clear that Puerto Rico is a "State" for purposes of (1) the Eleventh Amendment, see Nieves-Márquez v. Puerto Rico, 353 F.3d 108 (1st Cir. 2003); (2) the Dormant Commerce Clause, see Trailer Marine Transp. v. Rivera-Vázquez, 977 F.2d 1, 7 (1st Cir. 1992); and (3) the Double Jeopardy Clause, see United States v. López-Andino, 831 F.2d 1164, 1168 (1st Cir. 1987). Nonetheless, Plaintiffs' claim that Puerto Rico is a "State" for purposes of Article I is directly contradicted by controlling First Circuit precedent. See Igartúa IV, 626 F.3d at 594.[4]

Plaintiffs also argue that Puerto Rico has evolved into a *de facto* State and, thus, is entitled to congressional representation. Docket No. 1 at 6-15. Plaintiffs rely on Judge Gelpí's decision in Consejo de Salud de Playa de Ponce v. Rullan, 586 F. Supp. 2d 22, 43 (D.P.R. 2008) for the proposition that the historical evolution of Puerto Rico's relationship with the United States constitutes a *de facto* incorporation of the island, thus, granting the U.S. citizen-residents of Puerto Rico the right to participate in congressional elections. Docket No. 17 at 7-9. The Court in Consejo de Salud de Playa stated: "The court, rather, today holds that in the particular case of Puerto Rico, a monumental constitutional evolution based on continued and repeated congressional annexation has taken place. Given the same, the territory has evolved from an unincorporated territory to an incorporated one." 586 F. Supp. 2d at 43.

Assuming *arguendo* that the holding in Consejo de Salud de Playa is correct, this would only mean that Puerto Rico has become an incorporated territory and not a State. Since Article I

---

[4] Plaintiffs' Opposition to Defendants' Motion to Dismiss asserts that because the first three Igartúa cases relate to the right to vote for President and Vice-President of the United States under Article II, they cannot be relied upon to dismiss Plaintiffs' Complaint. Docket No. 17 at 6-7. Plaintiffs conveniently ignore, however, the fact that the claims in the Complaint at bar are virtually indistinguishable from those already rejected in Igartúa IV, 626 F.3d 592.

clearly grants the right to vote in congressional elections to the people of the several States and the Constitution "affords no flexibility as to" the meaning of the term "State," it necessarily follows that Puerto Rico's status as an incorporated territory does not entitle the island's residents to vote for representatives to the U.S. House of Representatives. Igartúa IV, 626 F.3d at 596. The First Circuit has also stated that "no case . . . has ever held that Puerto Rico is to be treated as the functional equivalent of a state for purposes of the House of Representatives clauses of Article I of the Constitution." Id. at 599. Therefore, to the extent that Plaintiffs' argument that Puerto Rico has become a *de facto* State resembles the "functional equivalent" argument raised in Igartúa IV, Plaintiffs' argument fails and "is refuted by a plain reading of the text of the Constitution." Id. (rejecting the *de facto* test because it is based on a misreading of Boumediene v. Bush, 553 U.S. 723 (2008)); see also Adams, 90 F. Supp. 2d at 56 (concluding that "the overlapping and interconnected use of the term 'state' in . . . Article I, the historical evidence of contemporary understandings, and the opinions of our judicial forebears all reinforce how deeply Congressional representation is tied to the structure of statehood").

Moreover, Plaintiffs once again argue that Puerto Rico's disenfranchisement violates other constitutional provisions, such as the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment, the Fifteenth Amendment, and the rights to vote and to travel that arise out of the Privileges and Immunities Clause. Docket No. 1 at 76-77. These claims have already been rejected on multiple occasions. This Court will not repeat itself. It suffices to say that since the Constitution does not affirmatively extend the federal franchise to the U.S. citizen-residents of Puerto Rico, "[i]t cannot, then, be unconstitutional to conclude the residents of Puerto Rico have no right to vote for Representatives." Igartúa IV, 626 F.3d at 596.

In other words, while the Court recognizes that Puerto Rico's disenfranchisement constitutes a "grave injustice" in terms of U.S. citizens being unable to choose among those competing ideologies, policies, and party platforms that directly affect them, "the deprivation of which [Plaintiffs] complain is created by the Constitution." Romeu v. Cohen, 265 F.3d 118, 122 (2d Cir. 2001).

In addition to Plaintiffs' constitutional claims, the Complaint asserts that the U.S. treaty and international law obligations confer the right to vote in congressional elections upon the U.S. citizen-residents of Puerto Rico. Docket No. 46-58. Specifically, Plaintiffs' claim relies on both customary international law and international agreements signed and ratified by the United States. Id. Once again, the First Circuit already evaluated and rejected these arguments in its prior decisions. See, e.g., Igartúa IV, 626 F.3d at 602 (stating that "[n]either international agreements nor customary international law mandates that residents of Puerto Rico who are U.S. citizens be able to vote for members of the House of Representatives."); Igartúa III, 417 F.3d at 149-152 (finding that customary international law and the international agreements mentioned in the Complaint at bar do not create any legal obligations binding as a matter of law).

For example, as to Plaintiffs' customary international law claim, the First Circuit previously stated that "international law does not require a particular form of representative government" and that "[i]f an international norm of democratic governance exists, . . . it is at a level of generality so high as to be unsuitable for importation into domestic law." Igartúa IV, 626 F.3d at 602 (quoting Igartúa III, 417 F.3d at 151) (internal quotation marks omitted). As to Plaintiffs' treaty-based claims, the First Circuit already held that the International Covenant on

Civil and Political Rights ("ICCPR"), the Universal Declaration of Human Rights, the Inter-American Democratic Charter of the Organization of American States, and the American Declaration of the Rights and Duties of Man "do not constitute domestic law because they are not self-executing and Congress has not enacted implementing legislation."  Id. at 602-603.[5] Consequently, this Court is bound by the First Circuit's clear statement in Igartúa IV that the en banc holding in Igartúa III forecloses us from considering these international law claims and reaching a contrary result. Igartúa IV, 626 F.3d at 602-603.

In conclusion, depriving the U.S. citizen-residents of Puerto Rico from participating in congressional elections, while perhaps troubling in a political and socio-economic sense, does not constitute a violation of a legally protected interest. Therefore, this Court holds that Plaintiffs have failed to show that they were deprived of a legally cognizable right.  In light of Plaintiffs' failure to satisfy the injury-in-fact requirement, there is no need to go further. It is clear that this Court has no subject matter jurisdiction over this case. See Allen, 468 U.S. at 750 (stressing that the standing doctrine is one of the most important doctrines arising out of Article III that delineates the boundaries for the exercise of federal jurisdiction).

### B.  The ICCPR's Impact to Plaintiffs' Standing: An Issue Worth Revisiting

While it is clear from the previous section that Plaintiffs' claim must be dismissed for lack of standing, it might be advisable for the First Circuit, if the opportunity arises, to reconsider its decision that Article 25 of the ICCPR is a non-self-executing provision. This

---

[5] The First Circuit also indicated in Igartúa IV that stare decisis requires ongoing adherence to the en banc ruling that these agreements are non-self-executing and, thus, do not create any legal obligations as a matter of domestic law. Igartúa IV, 626 F.3d at 603-606.

Court agrees with Judge Lipez's statement in <u>Igartúa IV</u> that "[g]iven the magnitude of the issues and Judge Torruella's forceful analysis [of the ICCPR's self-executing nature], this is one of those rare occasions when reconsideration of [<u>Igartúa III</u>'s] en banc ruling is warranted." <u>Igartúa IV</u>, 626 F.3d at 607 (Lipez, J., concurring in the judgment).

Article 25 of the ICCPR provides in relevant part, that "*[e]very* citizen *shall* have the right and the opportunity . . . (a) [t]o take part in the conduct of public affairs, directly or through freely chosen representatives; [and] (b) [t]o vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage." ICCPR art. 25 (emphasis added). The clear text of the treaty provision creates individual rights and entitles the U.S. citizen-residents of Puerto Rico to be able to vote and participate in the process of lawmaking and policymaking through freely chosen representatives. Nonetheless, three important questions remain for Plaintiffs' ICCPR claim to survive dismissal at this early stage: (1) whether this provision creates an obligation as a matter of domestic law, that is, whether the provision is self-executing and, thus, "law of the land" under the Constitution's Supremacy Clause; (2) whether this treaty provision is constitutional; (3) whether a right of action exists for the Plaintiffs to pursue this right. The First Circuit already answered the first question in the negative.  See <u>Igartúa III</u>, 417 F.3d at 150. Furthermore, it partially addressed the last two questions by stating, *inter alia*, that a treaty cannot override the Constitution, and that because "[t]reaties are made between states . . . citizens do not automatically have a right to sue upon them." <u>Id.</u> at 150. Given the complexity of the questions and <u>Igartúa III</u>'s cursory analysis of the ICCPR's legal status, it might be worthwhile to revisit this issue. After all, "at its core, this case is about whether a substantial group of United States citizens should be given a right that our country and the international

community agree is a fundamental element of a free society." Igartúa IV, 626 F.3d at 612 (Lipez, J., concurring in the judgment).  Plaintiffs and the U.S. citizen-residents of Puerto Rico deserve better than a summary dismissal on the grounds of stare decisis.

As to the first question, the First Circuit's holding that the ICCPR is a non-self-executing treaty was predicated on the following conclusions: (1) the text of the treaty provision is ambiguous as to "who should be entitled to vote for whom, or that an entity with the *negotiated* relationship that the United States has with Puerto Rico is nevertheless required to adopt some different arrangement as to governance or suffrage;" (2) the U.S. Senate consented to the treaty's ratification "on the express condition that it would be not "self-executing;" (3) the Supreme Court's dictum in Sosa v. Alvarez-Machain, 542 U.S. 692, 729 (2004) indicated that the ICCPR's substantive provisions are not self-executing; (4) courts must defer to the Political Branches' understanding and judgment in managing foreign affairs. See Igartúa III, 417 F.3d at 149-151.

There are various problems, however, with these underlying conclusions. First, it is hard to believe that the text of Article 25 could be characterized as ambiguous. This provision clearly mandates that *all* citizens of a ratifying State participate in the election of those who represent them.  See César A. López Morales, A Political Solution to Puerto Rico's Disenfranchisement: Reconsidering Congress's Role in Bringing Equality to America's Long-Forgotten Citizens, 32 B.U. Int'l L.J. 185, 204-211 (analyzing the text of Article 25 to conclude that U.S. citizens are entitled to participate in federal electoral processes regardless of whether they reside in one of the fifty states or in the territories).  The limited participation of the U.S. citizen-residents of Puerto Rico at the federal level and their exclusion from national electoral processes preclude them from choosing among those competing ideologies, policies, and party platforms that

directly affect them.[6] This exclusion is simply irreconcilable with the fact that "Article 25 lies at the core of the democratic government based on the consent of the people and in conformity with the principles of the [ICCPR.]" U.N. Office of the High Commissioner for Human Rights, General Comment No. 25, U.N. Doc. CCPR/C/21/Rev.1/Add. 7 General Comment No. 25, 57th Sess. (July 12, 1996); see also Igartúa IV, 626 F.3d at 620 (Torruella, J., concurring and dissenting in part) ("Plainly, the continued lack of political representation of [Plaintiffs] is a violation of the United States' treaty obligations under Article 25"). This holds true regardless of the political status that the Puerto Ricans acceded to in 1952. Since extending the right to vote to Puerto Ricans does not transform the island into one of the several states of the Union, the ongoing disenfranchisement in violation of Article 25 cannot be justified on the basis that Puerto Ricans have consented to it.

    Furthermore, since the United States did not issue a reservation excluding the U.S. citizen-residents of Puerto Rico on the basis of the island's Commonwealth status, it cannot be said that the United States effectively modified its legal obligation under the provision to guarantee all of its citizens the right to vote and to equal political participation at the federal

---

[6] The Human Rights Committee (the "Committee"), the treaty body charged with interpreting the treaty and monitoring its implementation, has previously expressed its concern regarding the disenfranchisement of the residents of the District of Columbia. In the 2006 "Concluding Observations" to the United States Second and Third Periodic Reports concerning the ICCPR, the Committee stated that the "residents of the District of Columbia do not enjoy full representation in Congress, *a restriction which does not seem to be compatible with article 25 of the Covenant.*" Concluding Observations of the Human Rights Committee on the United States of America, U.N. Doc. CCPR/C/USA/CO/3/Rev.1, at 11 para. 36 (2006) (emphasis added). Furthermore, the Committee recommended that the United States "ensure the right of [D.C. residents] to take part in the conduct of public affairs, directly or through freely chosen representatives, in particular with regard to the House of Representatives." Id. This observation applies with equal force to the current condition of the U.S. citizen-residents of Puerto Rico and the United States, as a ratifying State, must consider and embrace the Committee's interpretation of the treaty text.

level.[7] To the extent that this provision is self-executing and part of the law of the land, it cannot be seriously argued that someone may consent to the violation of federal law. Consequently, it is clear from the text that Puerto Ricans are entitled to participate in congressional elections and that Puerto Rico's political status does not prevent the United States from complying with its legal obligation.

Second, the fact that the ICCPR was ratified under the understanding that it would not be self-executing does not mean that such statement requires the courts to adopt this understanding. In fact, "separation of powers considerations prevent a court from relying exclusively on the Senate's declaration to determine that a treaty is non-self-executing. The Supremacy Clause and Article III require a court to examine independently the intentions of the treatymakers to decide if a treaty, by its own force, creates individually enforceable rights." Igartúa III, 417 F.3d at 185-86 (Howard, J., dissenting). The Supreme Court has also stated that the self-executing nature of a treaty "is, of course, a matter for [the courts] to decide," and not for the Senate to decide unilaterally. See Medellin v. Texas, 552 U.S. 491, 518 (2008). It follows that the excessive reliance on the Senate's understanding of the ICCPR's self-executing nature is misplaced. The Supreme Court's dictum in Sosa relied exclusively on this understanding to conclude that the ICCPR's substantive provisions are not self-executing. Since the Supreme Court has not had the opportunity to carefully consider and analyze the text of the ICCPR, let alone Article 25 of the treaty, this dictum does not foreclose a contrary interpretation. Therefore,

---

[7] "[N]o reservations or other limitations to the specific obligations contained in Article 25 were made, aside from the declaration of non-self-execution applicable to all substantive articles of the ICCPR." Igartúa III, 417 F.3d at 174 n. 42 (Torruella, J., dissenting) (citing 138 Cong. Rec. S4781, S4783).

courts should be reluctant to accept the dictum in <u>Sosa</u> without analysis. <u>See</u> <u>Cent. Va. Cmty.</u>
<u>Coll. v. Katz</u>, 546 U.S. 356, 363 ("[W]e are not bound to follow our dicta in a prior case in which
the point now at issue was not fully debated.").

Instead, the proper analysis of the provision's self-executing status requires courts to
redirect their attention to the text of Article 25.  <u>See</u> <u>Medellin</u>, 552 U.S. at 518-519 ("It is well
settled that the [i]nterpretation of [a treaty] . . . must, of course, begin with the language of the
Treaty itself.") It is worth mentioning that, due to a general reliance on the Senate's unilateral
declaration and the dictum in <u>Sosa</u>, the First Circuit held that the ICCPR as a whole is a non-
self-executing treaty. <u>See</u> <u>Igartúa III</u>, 417 F.3d at 149-151.[8]  It is clearly established, however, that
a treaty may contain both self-executing and non-self-executing provisions. <u>See</u> <u>Medellin</u>, 552
U.S. at 505-506 (quoting <u>Whitney v. Robertson</u>, 124 U.S. 190, 194 (1888)) (finding that treaties
may contain certain stipulations which are self-executing and others that require legislation to
make them operative).  This is why reviewing and analyzing the text of Article 25 is essential to
a proper determination of its self-executing nature. In this regard, Judge Torruella's compelling
analysis in <u>Igartúa IV</u> of this specific provision should be carefully considered in the event that
the Circuit chooses to review its previous en banc ruling. Finally, the Supreme Court stated in
<u>Medellin</u> that a treaty's use of mandatory, as opposed to discretionary, language is evidence of
self-execution. 552 U.S. at 508, 509 n.5 (distinguishing mandatory language such as "shall" from
discretionary language such as "undertakes to comply"). In this case, Article 25 of the ICCPR

_____

[8]  The First Circuit in <u>Igartúa IV</u> cited a series of circuit opinions for the proposition that the circuit
courts unanimously reinforce the First Circuit's holding in <u>Igartúa III</u>. <u>See</u> <u>Igartúa IV</u>, 626 F.3d at 606.
These opinions, however, *mostly relied* on the Senate's declaration and understanding of the treaty's nature
as a whole. In fact, none of these cases involved a careful and direct examination of the text of Article 25.

explicitly states that "[e]very citizen *shall* have the right and opportunity" to participate in policy-making processes "directly or through freely chosen representatives" and to vote in periodic elections. ICCPR art. 25 (emphasis added). It follows that the mandatory nature of Article 25's language weighs in favor of its self-executing nature.

In the event that the First Circuit reconsiders its analysis and finds that Article 25 is a self-executing provision, it must also determine whether this provision violates Article I of the U.S. Constitution. It is clear that the "Constitution is the supreme law of the land, and neither a statute nor a treaty can override the Constitution." Igartúa III, 417 F.3d at 148 (citations omitted). It is also clear, as stated above, that Article I of the Constitution only provides the right to vote in congressional elections to the people of the several States. This does not mean, however, that only these residents may participate in such elections. It is not entirely obvious that Article I's affirmative grant necessarily prohibits extending the right to vote to citizens residing in Puerto Rico via federal statute or a treaty.  See López Morales, supra at 219-222 (stating, in the context of Article II and the right to participate in presidential elections, that "the fact that only state residents may participate in presidential elections because of Article II is a non sequitur").

The "view that the Constitution does not necessarily forbid extensions of the rights it delineates" finds support in both case law and history. Igartúa IV, 626 F.3d at 608 (Lipez, J., concurring in the judgment). As both Judge Lipez and Judge Torruella pointed out in Igartúa IV, the Supreme Court held in National Mutual Insurance Co. v. Tidewater Transfer Co. that a federal statute extending Article III diversity jurisdiction to the District of Columbia was constitutional, even though the text of Article III refers only to "States." 337 U.S. 582 (1949).

This holding shows that the fact that the District of Columbia is not a "State" within the meaning of Article III "does not . . . determine that Congress lacks power under the provisions of the Constitution to enact . . . legislation" extending diversity jurisdiction over citizens of the District of Columbia. Id. at 588. Similarly, the fact that Puerto Rico is not a "State" within the meaning of Article I does not mean that Congress may enact a statute pursuant to its constitutional powers granting the right to vote to the U.S. citizen-residents of Puerto Rico.

Furthermore, to hold that the Constitution forbids Congress from acting in this manner would be to conclude that the political exclusion of some U.S. citizens from participating in congressional elections was a conscious product of our constitutional design. This conclusion is problematic in itself because every U.S. territory acquired up until the Spanish-American War was eventually admitted into the Union, thus suggesting "that territorial disenfranchisement was meant to be temporary" and that "territories would be held as states-in waiting." José R. Coleman Tió, Comment, Six Puerto Rican Congressman Go to Washington, 116 Yale L. J. 1389, 1394 (2007). It was, rather, the Insular Cases and the patent discrimination at the time against the inhabitants of the newly acquired Spanish territories that "permitted a sharp deviation from prior practice." Id.; see also Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of the Separate and Unequal (1985) (providing a compelling critique of the Insular Cases and the role that racism and discrimination against the newly conquered territories played in the decisions).[9]  Consequently, while it is true that the Constitution does not require the

---

[9] For further historical evidence of the discrimination and racism of the time, see Consejo de Salud Playa, 586 F. Supp. 2d 2 at 28 n. 9 (D.P.R. 2008) (citing 33 Cong. Rec. 2015, 3616 (1900)) (including statements in both the House and Senate Floors describing both Filipinos and Puerto Ricans as "mongrels . . . with

enfranchisement of U.S. citizens in Puerto Rico, it is also true that it does not prohibit Congress from acting to address this scenario of political inequality. See Igartúa II, 229 F.3d at 89 (per curiam) ("Indefinite colonial rule by the United States is not something that was contemplated by the Founding Fathers nor authorized per secula seculorum by the Constitution.").

Only after the First Circuit finds that Article 25 is self-executing and that it is constitutional would the Plaintiffs be able to allege a violation of a legally protected right. Other questions remain, however. As to the issue of the claim's redressability, a declaration that the United States is in default of its obligation under Article 25 "would have the practical effect of making it 'substantially likely that the President and other executive and congressional officials would abide' by the [Court's] interpretation of the law and proceed to act favorably on [Plaintiffs'] claims thereafter." Igartúa IV, 626 F.3d at 636 (Torruella, J., concurring and dissenting in part) (quoting Utah v. Evans, 536 U.S. 452, 460 (2002); Franklin v. Massachusetts, 505 U.S. 788, 803 (1992)) (alteration in original). This is because it would not be speculative to assume that a favorable judicial decision under these circumstances would result in some kind of action by congressional or executive officials. Id. at 637-638 (relying on Juda v. United States, 13 Cl. Ct. 667 (1987) to explain that the "presumption that executive officials will abide by an authoritative declaration of the United States law is a sound one").

A declaration as to these effects does not mean that Congress would be forced to either admit Puerto Rico as a state or amend the Constitution to permit Puerto Ricans to participate in congressional elections. Instead, other measures could be available that guarantee substantive

---

breath of pestilence and touch of leprosy . . . [and] with their idolatry, polygamous creeds and harem habits").

compliance with the legal obligations under ICCPR without involving the judiciary telling Congress to act in a specific manner.[10] In fact, congressional action is not even required. In the words of Judge Lipez, "If Puerto Rico residents' right to vote originates from a source of United States law other than the Constitution, . . . it is possible that declaratory relief could properly involve individual government officials rather than Congress." Igartúa IV, 626 F.3d at 636 (Lipez, J., concurring in the judgment). If the First Circuit adopts this analysis, it necessarily follows that Plaintiffs have a justiciable "case and controversy."

Finally, it is important to address the question of whether a right of action exists for Plaintiffs to be able to bring forth their ICCPR claim. This Court notes that the First Circuit has never reached this issue.  If the Circuit decides to take upon this question, it must do so while keeping these two things in mind: (1) Article 25 creates individual rights for the citizens of every ratifying State; and (2) Article 2 of the ICCPR requires every contracting State to ensure that any person whose rights under the ICCPR have been violated to provide "an effective remedy, notwithstanding that the violation has been committed by persons acting in an official

---

[10]  For example, Professors Robert Sloane and Gary Lawson suggest that:

> Congress could authorize . . . the local election of a number of persons in the various territories equal to the number of representatives in Congress to which they would be entitled if they were states. It could then allow those elected officials to participate, in a substantive but formally nonbinding fashion, in congressional deliberations and votes. And Congress could then cast and count its formal votes in a fashion that conforms to the outcomes that would have resulted if the votes of the territorial representatives had official weight. Congress could even inscribe these procedures in House and Senate rules, though such rules could be repealed by a majority at any time and therefore would not add value to the mix.

Gary Lawson & Robert Sloane, The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered, 50 B.C.L. Rev. 1123 (2009).

capacity." ICCPR art. 2. Article 2 also requires, in relevant part, that "such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, . . . and that the competent authorities shall enforce such remedies when granted." Id. It is hard to conceive that a treaty with such mandatory language and clear directives to the judiciary does not create a right of action for Plaintiffs.  In any event, this is a complicated question that the First Circuit should consider if it has the opportunity.

Notwithstanding these observations as to the ICCPR claim, it is clear that Plaintiffs' Complaint must be dismissed with prejudice pursuant to the Circuit's previous decisions, specifically Igartúa IV. These observations only mean to emphasize the need to reconsider several conclusions in light of the exceptional importance of the issues raised. The right to vote and to equal political participation is pivotal to our constitutional system, if not democracy itself. The notions of political legitimacy and the consent of the governed are basic pillars of our system of government and are deeply rooted in our Nation's history.  Federal courts must be eager to protect these pillars and guarantee the proper functioning of an open and effective democratic process that is properly grounded on the principle of popular sovereignty. In order to be able to fulfill this constitutional duty, it is advisable to reconsider the analysis of those questions raised in this last section of the opinion.

## CONCLUSION

For the reasons outlined above, specifically Sections I and II.A of this Opinion and Order, Plaintiffs' Motion for a Three-Judge District Court is DENIED and Defendants' Motion to Dismiss is GRANTED.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

Civil No. 14-1558 (JAG)                                                                                    23

In San Juan, Puerto Rico, this 28th day of January, 2015.

                                                    S/ Jay A. Garcia-Gregory
                                                    JAY A. GARCIA-GREGORY
                                                    United States District Judge